**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION,**
Appellant,

v.

**Paul R. KUNTZ and John G. Cvitkovic, Individually and as Members of a Class, Appellees.**

**PACIFIC MARITIME ASSOCIATION,**
Appellant,

v.

**Paul R. KUNTZ and John G. Cvitkovic, Individually and as Members of a Class, Appellees.**

**Nos. 18981, 18987.**

United States Court of Appeals Ninth Circuit.

June 26, 1964.

Norman Leonard, Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., Robert Duggan, Seattle, Wash., for appellant International Longshoremen's and Warehousemen's Union.

Richard Ernst, Marvin Taylor, G. L. Munter, Jr., San Francisco, Cal., J. Tyler Hull, Bogle, Bogle & Gates, Seattle, Wash., for appellant Pacific Maritime Ass'n.

Paul D. Jackson, Seattle, Wash., for appellees.

Before JERTBERG, MERRILL and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

Plaintiffs Kuntz and Cvitkovic brought this class action under § 301(a) of the Labor Management Relations Act [29 U.S.C. § 185(a)] [1] on behalf of themselves and 36 other ship clerks on the Seattle waterfront and against the Pacific Maritime Association [P.M.A.] and the International Longshoremen's and Warehousemen's Union [I.L.W.U.]. The gravamen of their claim is a breach of the P.M.A. and I.L.W.U. collective bargaining contract; they contend that the breach consisted of a contract amendment that stripped them of a "vested right," namely a preferred seniority status previously granted by the defendants.

Defendants filed motions to dismiss the action on the several grounds that the Federal Court lacked jurisdiction over the subject matter of the suit; that the complaint failed to state a claim on which relief might be granted and that plaintiffs had failed to exhaust administrative remedies. Additionally, they moved to stay all proceedings until after plaintiffs had resorted to grievance and arbitration procedures, assertedly available both under the contract itself and § 9 of the N.L.R.A. (29 U.S.C. § 159(a)).

[1] The District Judge denied all these motions (as well as plaintiffs' motion for temporary injunctive relief) but stated that in his opinion the orders, although interlocutory, involved controlling questions of law within the meaning of 28 U.S.C. § 1292(b). Agreeing, this court permitted defendants to appeal. For reasons hereinafter appearing, we reverse the order denying defendants' motion to dismiss the action for failure to state a claim, and remand the cause with directions to the District Court to grant summary judgment in favor of defendants.[2]

1. "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a).

2. We do not consider defendants' motions to dismiss for failure to exhaust administrative remedies by filing unfair labor charges with the N. L. R. B. and to invoke as a condition precedent to suit those grievance procedures which defendants contend are (1) required under the collective bargaining agreement, and (2) contemplated by § 9 of the N. L. R. A. [29 U.S.C. § 159(a)]. The result we have reached on other grounds renders such an inquiry unnecessary.

Defendants' motion attacking jurisdiction was without merit, as the District Judge correctly held. Until Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962) it was not clear whether any claim at all of an individual arising from breach of the collective bargaining contract was within the jurisdiction of the federal courts by virtue of § 301. However, in that case the Supreme Court, after considering a number of its earlier decisions, concluded that some claims were, saying "[t]he concept that all suits to vindicate individual employee rights arising from a collective bargaining contract should be excluded from the coverage of § 301 has thus not survived." Id., 371 U.S. at 200, 83 S.Ct. at 270. But in Smith the dispute was over wages and it still was not clear until Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), decided after the District Judge had made his rulings, whether a claim founded on breach of contract but which also was arguably within the jurisdiction of the N.L.R.B. could be prosecuted in the courts under § 301. However, in Humphrey the Supreme Court held such a claim is.[3] As the concurrence of Justice Goldberg served to emphasize, [375 U.S. at 351–359, 84 S.Ct. 363] in certain circumstances, actions for breach of a bargaining representative's duty of fair, representation [see Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)] may be laid under § 301 if a sufficient connection between the contract and breach of duty is shown, 375 U.S. at 343, 84 S.Ct. 363. Thus, for example, if the action complained of is taken pursuant to or implemented by the contract (as here) jurisdiction may vest under § 301.

We treat defendants' motion to dismiss for failure to state a claim as a motion for summary judgment to be disposed of as provided in Rule 56, F.R.Civ. P. This procedure is permissible under Rule 12(b), F.R.Civ.P., for here there were on file, and the court considered, numerous affidavits which demonstrated conclusively the absence of any genuine issue of material fact.[4]

3. Still remaining is the question reserved in Smith: [371 U.S. at 197–198, 83 S.Ct. 267] whether the likelihood of "serious problems" calls for reference to the primary jurisdiction of the administrative agency. See United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). We, like the Court in Humphrey, do not think this such a case.

4. Where it is apparent that the court below had before it and considered matters outside the complaint, the Court of Appeals is not bound by the fact that the appeal is, in form, from a motion to dismiss. Dinwiddie v. Brown, 230 F.2d 465, 468 (5th Cir. 1956); Lane Bryant, Inc. v. Maternity Lane, Ltd., 173 F.2d 559 (9th Cir. 1949). Rather, it is to be treated as a motion for summary judgment as permitted by Rule 12(b), F.R.Civ.P. In this connection, the Second Circuit observed that " * * * [D]efendants' filing of affidavits with their motion essentially converted it into a motion for summary judgment, F.R. [Civ.P.] 12(b) and placed upon plaintiff an obligation to disclose the merits of their case." Plaintiff's failure to do so ends their entitlement to liberal construction of the pleadings in their favor. Cook v. Hirschberg, 258 F.2d 56, 57–58 (2d Cir. 1958). That rule obtains in this circuit. Grabner v. Willys Motors, Inc., 282 F.2d 644, at n. 3, p. 645 (9th Cir. 1960); Ellis v. Carter, 291 F.2d 270, 275 (9th Cir. 1961), and in other circuits as well. William J. Kelly Co. v. Reconstruction Finance Corporation, 172 F. 2d 865, 866 (1st Cir. 1949); Dinwiddie v. Brown, supra. It was the procedural vehicle employed in Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9th Cir. 1962) cert. den. 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 a context similar to the case at hand, where an appeal from a motion to dismiss was treated as a motion for summary judgment when it was apparent the District Court had so treated it. Moreover, it is doubtful that § 1292(b) has application to rulings on the sufficiency of a pleading, since ordinarily the pleader may be given leave to amend. Gottesman v. General Motors, 268 F.2d 194, 196 (2d Cir. 1959). But see Jewel Tea Co., Inc. v. Local Unions, etc., 274 F.2d 217 (7th Cir. 1960).

Thus, from the materials before the District Court, the following uncontroverted facts appear:

The defendant P.M.A. is the collective bargaining representative of employers of ship clerks along the West Coast of the United States, and its co-defendant I.L.W.U. is the representative of the clerks themselves. The parties' contract is administered by the Joint Coast Labor Relations Committee (Coast Committee), a body composed of equal numbers (3) of employee-employer representatives having the broad power to make amendments and other changes in its provisions. The Seattle Checkers Joint Labor Committee (Local Committee), an adjunct of the Coast Committee, is charged with the day to day administration of the contract in the area of the Port of Seattle, subject always to the "ultimate control" of the Coast Committee. Accordingly, the Local Committee maintains the lists of longshoremen eligible for employment in Seattle and vicinity and may make such increases or reductions in the number of men carried on them as it deems essential to a stable and sufficient labor supply. It also has charge of the dispatching hall, investigates and adjudicates all grievances and disputes, and performs all other functions specified in the contract or assigned it by the defendants directly or through the Coast Committee.

Ship clerks in the Seattle area are classified for the purpose of employment and are carried on the employment lists in the following order of seniority: Class "A" clerks, consisting of fully registered men; Class "B" clerks, those of limited registration, and unregistered clerks or "casuals" as they are generally termed. Registration carries with it the right to tenure of employment, vacations with pay, pensions, medical care, and other valuable benefits not enjoyed by the unregistered employee.

During the first half of the year 1963, the Local Committee, after securing permission from the Coast Committee to increase the number of Class "B" registrants, took applications from and gave competitive examinations to a large number of "casuals." From them it selected and registered the 38, by and on behalf of whom this suit was brought, and dropped all remaining casuals from the employment lists. Fourteen of the latter then filed charges with the N.L.R.B., asserting that the P.M.A. (pursuant to a conspiracy with the I.L.W.U.) had committed unfair labor practices in violation of § 8 of the N.L.R.A.; more particularly they asserted that the Local Committee had unfairly conducted the examination, that its selections were arbitrarily made and that it had disregarded the rules and standards for registration approved by the Coast Committee.

During the investigation, officials of the N.L.R.B. suggested an administrative settlement and informally agreed to drop the charges if the 38 new registrants were de-registered and all former casuals were reinstated.[5] The matter was submitted for consideration to the Coast Committee. At a series of meetings held during August, 1963 that Committee disapproved the action of the Local Committee and ordered the restoration of the status of all men who

---

5. Plaintiffs do not really dispute this, but remonstrate that the N. L. R. B. did not *demand* this action. That fact, of itself, however, is not sufficient to create an issue of fact such as to resist summary judgment. Even after taking into full consideration the heavy burden resting on a moving party to make a clear showing of what the truth is, the controlling principle remains that " * * * an opposing party who has no countervailing evidence and who cannot show that any will be available at the trial [is not] entitled to a denial of the motion for summary judgment on the basis of a hope that such evidence will develop at the trial. And, although the moving party be unaided by any presumption, when he has clearly established certain facts the particular circumstances of the case may cast a duty to go forward with controverting facts upon the opposing party, so that his failure to discharge this duty will entitle the movant to summary judgment." 6 Moore's Fed.Practice § 56.15 [3] at pages 2129–2130 (1953), and cases there cited.

had been affected, and the resumption of former procedures for the dispatch of non-registered clerks. At the same time the P.M.A. and I.L.W.U. formally approved by amendment to the collective bargaining contract the action of the Coast Committee. On August 27, 1963, the Local Committee implemented these orders and the N.L.R.B. afterwards dismissed the charges against P.M.A. Then, during October, the Coast Committee, after adopting and approving rules and procedures for selecting and registering ship clerks, ordered 53 Class "B" clerk positions—instead of 38 previously settled upon—added to the registration lists at Seattle.[6]

In support of their motion to dismiss, defendants point out that both the N.L.R.A. and the collective bargaining agreement under which they operate vested them as representative of their respective groups, with power to amend the agreement as it related to seniority of employee units; they urge, citing Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) and Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9th Cir. 1962) cert. den. 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229,

that the exercise of that power, unless motivated by "hostile discrimination" is not actionable and that here the complete absence of such a motive conclusively appears.[7]

Plaintiffs reply that neither of those cases was a suit for breach of contract under § 301, but instead both were predicated upon a breach of the duty of fair representation flowing from the relationship created by the contract. Their position is that "Section 301 invokes traditional contract law (and) [t]he broad authority granted collective bargaining agents by the policy of Federal Labor Law does not totally vitiate the law of contracts and third party beneficiaries." [8] Further, plaintiffs argue that motive, if relevant at all in this type of suit, is a matter of defense to be pleaded and proved, not by them, but by the collective bargaining representatives.

While it is true that neither Ford nor Hardcastle were brought under § 301, nevertheless we conclude that the proposition they stand for is necessarily applicable to a suit predicated upon the amendment of a contract as well as to a suit for breach of duty of fair representation.[9]

6. When the matter was before the District Court in October, a meeting of the Local Committee had been called but not yet held, to start proceedings to fill the 53 vacancies. However, one of the Committee members stated by affidavit that "P. M. A. further intends to propose and expects the Local Union to agree, as has the International Union, that all applicants, including the plaintiffs * * * and the other casuals in this case will be given an equal opportunity to apply for registration and will be considered on the basis of their qualifications, measured by the standards set out in the documents attached hereto (that is, the rules of the Coast Committee) * * * and without discrimination because of their having instituted proceedings before the N. L. R. B. or this court."

7. In fact, good faith is practically conceded for Plaintiff Kuntz asserted in an affidavit filed with the complaint that "Plaintiffs and their class are not claiming discrimination against them as such, but are claiming arbitrary and unreasonable action taken without just cause and in breach of agreement."

8. J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the case cited by plaintiffs, stands for no such proposition. Discussing the question of whether individual hiring contracts could supersede and waive the benefits of the collective agreement, the Supreme Court merely analogized an employee reaping benefits under the collective agreement to a third party beneficiary. It stated "* * * [A]n employee becomes entitled by virtue of the Labor Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms." Id., 345 U.S. at 336, 73 S.Ct. at 579. Manifestly this cannot be transmuted into a holding that traditional contract law applies to an action such as the one here.

9. Particularly in view of the fact that until Humphrey, it was unclear whether an action for breach of duty of fair representation could be brought under § 301. See opinion, p. 168.

In Ford, one of the principal questions concerned the scope and extent of the bargaining representative's power and the nature of its duty to those it represented. The Court there held that the representatives are vested with broad statutory authority extending to matters of seniority between groups of employees, and went on to say that:

" * * * the authority of bargaining representatives, however, is not absolute * * *. Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all those members, without hostility to any." Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

But the Court was quick to add that:

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Id., 345 U.S. at 338, 73 S.Ct. at 686.

And in Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 185, cert. denied, 371 U.S. 920, 83 S.Ct. 288, 9 L. Ed.2d 229, this Court reached the conclusion that because of the very nature of the bargaining process "a bad faith motive, an intent to hostilely discriminate against a portion of the * * *" group represented was "[a]n essential element * * * necessary to raise a limitation upon a union's discretion in bargaining with respect to seniority rights * * *."

And more recently in Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) the Supreme Court has again reiterated that:

"Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and the grievance processes."

■■ The settlement of a labor dispute, whether accomplished by amendment of the contract or by resort to an already existing contract provision, may affect rights which in other fields are regarded as vested and in a manner which would be deemed "*ex post facto.*" But where the power to bargain is not limited by the contract and since "[c]ompromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation", [Ford Motor Co. v. Huffman, 345 U.S. at 338, 73 S.Ct. at 686] we believe that when "vested rights" are impaired or extinguished in the course of the bargaining, any recourse by the person affected must then depend upon "a bad faith motive, an intent to hostilely discriminate" on the part of the bargaining representative. And here, even aside from the plaintiff's affidavit asserting that no such discrimination existed, there is not the slightest suggestion of bad faith on defendants' part.

The matter is remanded to the District Court, with directions to enter orders and a judgment conforming to this opinion.